UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN


JENNIFER LOVE,

                                Honorable

      Plaintiff,

                                Case No:

v.

                                **COMPLAINT**

GENESEE HEALTH SYSTEM,
DANIS RUSSELL, Director of GENESEE
HEALTH SYSTEM, in his official capacity,
REGION 10 PIHP, MICHIGAN DEPARTMENT OF
HEALTH AND HUMAN SERVICES,
and NICK LYON, Director of MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN
SERVICES, in his official capacity,

      Defendants.

_____/

MICHIGAN PROTECTION & ADVOCACY
SERVICE, INC.
Andrea L. Rizor (P78382)
Chris E. Davis (P52159)
Attorneys for Plaintiff
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
(517) 487-1755
arizor@mpas.org
cdavis@mpas.org

_____/

## COMPLAINT

### I. INTRODUCTION

1.  This is an action brought by Plaintiff, Jennifer Love, under the Americans with Disabilities Act (ADA) (42 U.S.C. § 120101), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), the Medicaid Act, the Nursing Home Reform Act (42 U.S.C. § 1396r), and 42 U.S.C. § 1983.

2.  Plaintiff is a 46-year-old Medicaid beneficiary with mental illness.

3.  Despite Plaintiff's disabilities, she is capable of living in a community setting.

4.  Federal law requires Defendants to provide long term care services in the most integrated setting appropriate to Plaintiff's needs. It prohibits unnecessary segregation and isolation. These rights have been affirmed by the United States Supreme Court in *Olmstead v. L.C.*, 527 U.S. 581 (1999).

5.  Defendants have failed to accommodate Plaintiff's disabilities to ensure she receives treatment and services in the most integrated setting appropriate to her individual needs. This failure has resulted in Plaintiff living in the most restricted setting possible – a nursing facility.

2

6.     To prevent unnecessary institutionalization in nursing facilities and to offer people with disabilities meaningful opportunities to choose home and community based services, the Medicaid Act and the Nursing Home Reform Act (NHRA) require the state to perform comprehensive assessments and reviews to identify the care and services needed to enable individuals to remain in or return to the community. 42 U.S.C. § 1396r. Such services must be provided with reasonable promptness. 42 U.S.C. § 1396a(a)(8).

7.     The NHRA addresses the problem of unnecessary placement or warehousing of people with psychiatric and developmental disabilities in nursing facilities. Special preadmission screening and resident reviews (PASARR) are required for all individuals believed to have psychiatric or developmental disabilities to determine whether nursing facility level of care is required or whether services should be provided in the community. 42 U.S.C. §§ 1396r(b)(3)(F)(i), (e)(7)(A)-(B); 42 C.F.R. §§ 483.112, 483.128, 483.132, and 483.134.

8.     Defendants have failed to implement recommendations under PASARR evaluations by not providing the services Plaintiff requires.

9.     As a result, Plaintiff has been compelled to reside in a nursing facility.

10.    In effectively segregating Plaintiff and failing to provide her with access to community services and supports, Defendants have disregarded the integration and nondiscrimination mandates of Title II of the ADA, the Rehabilitation Act of 1973, the NHRA, the Medicaid provisions of the Social Security Act, and 42 U.S.C. § 1983.

## II. JURISDICTION AND VENUE

11.    This action is brought pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Social Security Act, 42 U.S.C. §§ 1396r(b)(3)(F); 1396a(a)(8).

12.    Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343.

13.    Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201, 2202; 29 U.S.C. § 794a; 42 U.S.C. § 1983; and 42 U.S.C. § 12133.

14.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as all of the acts and omissions giving rise to the claims occurred in Genesee County.

## III. PARTIES

### A. The Plaintiff

15.   Plaintiff is a 46-year old Medicaid beneficiary. She has been diagnosed with serious mental illnesses that significantly limit her life activities, including self-care and communication.

16.   Plaintiff currently resides at Fenton Health Care, a nursing facility located in Genesee County.

17.   Plaintiff is capable of living in a community setting, outside of the nursing facility, with the Medicaid specialty support services she is entitled to receive under the Michigan Medicaid state plan.

### B. The Defendants

18.   Defendant, MDHHS, is the agency designated as the single state agency responsible for administering and implementing Michigan's Medicaid program under 42 U.S.C. § 1396a(a)(5).

19.   Nick Lyon is the Director of MDHHS.

20.   As Director, Nick Lyon is responsible for ensuring that Michigan's Medicaid program is administered and implemented consistent with the requirements of federal and state law.

21.    Defendant, Nick Lyon, is responsible for administering and overseeing Michigan's entire Mental Health system. M.C.L. §§ 330.1104, 330.1116, which states:

> The health of the people of the state is a matter of primary public concern, and as required by section 8 of article VIII of the state constitution of 1963, which declares that services for the care, treatment, education, or rehabilitation of those who are seriously mentally disabled shall always be fostered and supported, [MDHHS] shall continually and diligently endeavor to ensure that adequate and appropriate mental health services are available to all citizens throughout the state.

22.    Defendant, Nick Lyon, is being sued in his official capacity.

23.    Defendant, Genesee Health System (GHS), is a community mental health service program established by the Michigan Mental Health Code at M.C.L. § 330.1206 (stating that the "purpose of a community mental health services program shall be to provide a comprehensive array of mental health services appropriate to conditions of individuals who are located within its geographic service area, regardless of an individual's ability to pay").

24.    GHS is required to provide mental health services to adults with serious mental illness living in Genesee County. M.C.L. § 330.1208.

25.     Defendant, Danis Russell, is the Director of GHS. He has authority over and is ultimately responsible for all of GHS' services, programs, and operations.

26.     Defendant, Danis Russell, is being sued in his official capacity.

27.     Defendant, Region 10, the prepaid inpatient health plan (PIHP) for Genesee County, is considered a Medicaid managed care organization under M.C.L. § 400.109f.

28.     Under federal law, a Medicaid managed care organization provides or arranges for services for Medicaid enrollees under 42 U.S.C. § 1396u-2(a)(1)(B).

## IV. Statutory Provisions

### A. Brief Overview of the Medicaid Program in Michigan for Individuals with Developmental Disabilities/Mental Illness.

29.     Plaintiff incorporates by reference paragraphs 1 through 28 as if fully set forth herein.

30.     The Medicaid program is jointly funded by the state and federal government under Title XIX of the Social Security Act.

31.     The Medicaid program provides medical assistance for certain low-income children, families, pregnant women, disabled adults, and elderly individuals.

32.  Michigan must operate and administer its Medicaid program in compliance with federal Medicaid statutes and regulations.

33.  Each state submits a State Plan for how the Medicaid program will be administered in accordance with federal law. 42 U.S.C. § 1396a(a).

34.  Under federal law, that State Plan must contain and describe the nature and scope of the state's Medicaid program. 42 C.F.R. § 430.10.

35.  MDHHS has designated itself as the single state Medicaid agency responsible for administering the Medicaid program in Michigan under 42 U.S.C. § 1396a(a)(5).

36.  MDHHS contracts out the provision of Medicaid services to ten PIHPs throughout the state, including Region 10 PIHP.

37.  Medicaid-covered specialty services and supports for Medicaid beneficiaries with a serious mental illness, developmental disability, serious emotional disturbance, or substance abuse disorder are managed and delivered by those PIHPs. M.C.L. § 400.109f.

38.  MDHHS contracts with Region 10 PIHP to provide and deliver these specialty services and supports as the PIHP for Genesee County. 42 U.S.C. § 1396u-2(a)(1)(B).

39. Under M.C.L. 400.109f, Region 10 PIHP is "responsible for providing defined inpatient services, outpatient hospital services, physician services, other specified Medicaid state plan services, and additional services approved by the Centers for Medicare and Medicaid services under section 1915(b)(3) of title XIX of the Social Security Act, 42 U.S.C. § 1396n."

40. Region 10 PIHP contracts out the provision of services to Defendant GHS.

41. MDHHS is required to have methods of keeping itself informed of local agency adherence to the State Plan and must take corrective action to ensure such adherence. 42 C.F.R. § 435.903.

42. The Medicaid agency may not delegate to, other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, or regulations on program matters. 42 C.F.R. § 431.10.

43. MDHHS is required to make rules and regulations that it follows in administering the plan or that are binding upon local agencies that administer the plan. 42 C.F.R. § 431.10.

### B. The Nursing Home Reform Act.

44. States must cover nursing facility services as part of their Medicaid programs. 42 U.S.C. § 1396a(a)(10)(A) and 1396d(a)(4)(A).

45. A nursing facility is an institution that primarily provides: (1) nursing care; (2) rehabilitation services for those who are sick, injured or disabled; and (3) health-related care and services to individuals who because of their mental or physical condition, require care and services which can only be provided in an institutional setting. 42 U.S.C. § 1396r(a)(1)(A-C).

46. Nursing facility services are defined as services "which are or were required to be given an individual who needs or needed on a daily basis nursing care . . . or other rehabilitation services which as a practical matter can only be provided in a nursing facility on an inpatient basis." 42 U.S.C. § 1396d(f).

47. Congress passed the Nursing Home Reform Amendments to the Medicaid Act to address the widespread problem of warehousing people with psychiatric and developmental disabilities in the nation's nursing facilities. 42 U.S.C § 1396r. It enacted the Pre-Admission Screening and Annual Resident Review (PASARR) provisions of the

NHRA to prevent the unnecessary admission and confinement of people with psychiatric and developmental disabilities in nursing facilities and to remedy ongoing instances of the same.

48. The PASARR pre-admission screening (Level I) is designed to identify individuals suspected of having mental illness, mental retardation, or related conditions. See 42 U.S.C. § 1396r(e)(7)(B).

49. If the PASARR Level I screen identifies the individual as being suspected of having the above conditions, MDHHS must conduct a PASARR Level II evaluation. See 42 U.S.C. § 1396r(e)(7); 42 C.F.R. § 483.128. The function of the Level II evaluation is to determine whether a person is appropriate for admission to a nursing facility because he or she needs a level of care that can only be provided in a nursing facility and, if so, whether that person needs specialized services while living in the nursing facility. 42 U.S.C. § 1396r(e)(7)(B)(ii); 42 C.F.R. §§ 483.126,128,132,136.

50. Under 42 C.F.R. § 483.132(a), states must assess, for each individual who has mental illness, whether:

   (1) The individual's total needs are such that his or her needs can be met in an appropriate community setting;

   (2) The individual's total needs are such that they can be met only on an inpatient basis, which may include the option of placement in a home and community-based services

11

waiver program, but for which the inpatient care would be required;

(3)    If inpatient care is appropriate and desired, the NF is an appropriate institutional setting for meeting those needs in accordance with § 483.126; or

(4)    If the inpatient care is appropriate and desired but the NF is not the appropriate setting for meeting the individual's needs in accordance with § 483.126, another setting such as an ICF/IID (including small, community-based facilities), an IMD providing services to individuals aged 65 or older, or a psychiatric hospital is an appropriate institutional setting for meeting those needs.

51.    Following admission to a nursing facility, annual reviews must be conducted to determine whether an individual with a related condition continues to need a nursing level of care and to require confinement in a nursing facility or whether the individual's needs could be met in the community. 42 U.S.C. § 1396r(e)(7)(B)(ii); 42 C.F.R. §§ 483.106(a)(3), 114(b), 130, and 132.

52.    Whenever the PASARR review process determines that the person needs services outside of the nursing facility, those services covered under Michigan's Medicaid program must be provided with reasonable promptness. 42 U.S.C. § 1396a(a)(8), (a)(10)(A); 42 C.F.R. § 435.930.

### C. The Americans with Disabilities Act (ADA).

53.   Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

54.   Title II's implementing regulations require, under 28 C.F.R. § 35.130(d), that a "public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

55.   In passing the ADA, Congress recognized that:

[I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; [and]

[H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]

42 U.S.C. § 12101(a)(5), (a)(2).

56.   The U.S. Supreme Court has held segregation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600-601 (1999).

57.   Unjustified institutionalization "constitutes a form of discrimination based on disability prohibited by Title II." *Id.* at 596.

**D. Section 504 of the Rehabilitation Act of 1973.**

58.   Like the ADA, Section 504 of the Rehabilitation Act prohibits discrimination of individuals with disabilities under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

59.   Its implementing regulations require entities receiving federal financial assistance to "administer programs and activities in the most integrated setting appropriate. . ." 28 C.F.R. § 41.51(d).

60.   The implementing regulations further prohibit Defendants from directly, or through other arrangements, utilizing "criteria or methods of administration" that effectively subject individuals with disabilities to discrimination on the basis of their disability or that "substantially

impair accomplishment of the objectives" of the program with respect to individuals with disabilities. 28 C.F.R. § 41.51(b)(3).

## STATEMENT OF FACTS

61. Plaintiff is a 46-year old Medicaid beneficiary. She has been diagnosed with serious mental illness.

62. Plaintiff lived in community settings since 2007 by residing in adult foster care homes. Prior to entering the facility, Plaintiff had been volunteering up to three times per week for several years at McLaren Hospital. She also participated in water aerobics classes at the gym.

63. Despite not having been diagnosed with dementia or suffering from any memory disorder, Plaintiff now resides on the dementia wing at Fenton Health Care in Genesee County, a nursing facility.

64. Plaintiff shares a room with three individuals. Each bed is separated by hospital curtains, and the room lacks any real privacy.

65. Fenton Health Care currently has no programs that enable Plaintiff to interact or engage with her community outside of the facility.

66. The only time Plaintiff gets out into the community is when her mother or family transport her out of the facility.

67. Plaintiff entered the nursing facility in or around October 2016.

68.    Plaintiff broke her ankle in the shower and ended up in the nursing facility for rehabilitation because her adult foster care home could not accommodate her needs.

69.    Upon information and belief, Plaintiff completed physical and occupational therapy at the facility in less than 90 days.

70.    It was expected that when Plaintiff completed physical therapy she would leave the nursing facility and go back to living in the community.

71.    To determine what services Plaintiff would require, GHS staff completed a Level II OBRA screen on or around January 11, 2017.

72.    This OBRA screen included GHS' recommendation against continued nursing facility care.

73.    GHS determined Plaintiff "needs continued mental health treatment and to return to a community setting. . . . [D]ue to her age and capability she needs to relocate to a community setting as soon as possible." Level II OBRA assessment.

74.    GHS determined "she no longer meets the criteria for skilled nursing care." *Id.* at 10.

75.    Despite those recommendations, MDHHS approved nursing home placement. MDHHS determined that the Plaintiff "qualifies for the

level of services provided by a nursing facility and requires specialized mental health/developmental disabilities services." *Id.*

76. According to GHS' medical records, Plaintiff notified GHS staff "she feels like she is in jail as she doesn't have the ability to leave." GHS Medical Record, December 2, 2016.

77. GHS' medical records also indicate Plaintiff thought her continued placement was a result of her incontinence: "OBRA has been to see her and that they are extending her stay in the Nursing Home until she can go to the bathroom without a brief. Client believes now that she might be there for up to a year. This she is upset about . . ." GHS medical records, January 13, 2017.

78. GHS' medical records do not reflect that Plaintiff was ever informed by GHS she had a right to community living despite her incontinence.

79. GHS knew Plaintiff was upset about living in the nursing facility. This knowledge is reflected in the medical records noting that Plaintiff's "depression is situational and related to being in the nursing facility." GHS Medical Record, August 22, 2017.

80. As documented in Defendant GHS' medical records, Plaintiff made repeated requests for services in the community, noting her urgent desire to get out of the nursing facility.

17

81. As documented in the nursing facility's medical records, Plaintiff made repeated requests for community based services, noting her urgent desire to get out of the nursing facility.

82. The nursing facility's medical records reflect its own attempts to get help from GHS to find Plaintiff appropriate community based services dating all the way back to December 29, 2016.

83. GHS showed little motivation to find community placement for Plaintiff after MDHHS approved nursing facility placement for one year, despite GHS' recommendations that she did not belong in the facility and knew it could be damaging to her mental health as stated in the OBRA Assessment.

84. The nursing facility similarly struggled to get services moving for Plaintiff as reflected in its medical records. In September 2017, records reflect the nursing facility notified GHS' OBRA coordinator of Plaintiff's "need and want for alternative placement." The nursing facility was directed to contact the GHS case manager. Fenton Health Care, September 6, 2017.

85. Over a month later, the nursing facility once again reached out to GHS' case manager asking for help with community placement. Fenton Health Care, October 19, 2017.

86. According to the nursing facility's records, GHS asked about sending Plaintiff to another nursing facility instead as "she has been approved to stay in long term care until January. Writer informed [client's GHS case manager] that referrals had been sent with zero responses back and that even though she had been approved until January did not mean she had to stay in a long-term care setting." *Id.*

87. A new OBRA screen was completed by Defendant GHS on or around January 31, 2018.

88. The 2018 OBRA screen showed that Plaintiff's functional assessment had greatly improved since the OBRA screen in January 2017. Recall, however, that after the OBRA screen in January 2017, Defendant GHS advised *against* nursing facility placement.

89. Despite Plaintiff's improvement in her condition since 2017, GHS recommended nursing facility placement, despite Plaintiff's requiring it even less. MDHHS supported the GHS recommendation. Level II OBRA assessment, 2018.

90. MDHHS determined "the individual qualifies for the level of services provided by a nursing facility and requires specialized mental health/developmental disabilities services." Id.

91.    Plaintiff remains in the nursing facility not because she *requires* facility level care, but because Defendants have failed to provide long term care services in the community. Defendant GHS' OBRA assessment is disheartening:

> There is a clear lack of placement options for Jennifer outside of a skilled nursing facility at this time. Although the team as a whole does not want her to remain in a NF because we are concerned about lack of community inclusion, regression in skills and an even bigger decrease in productivity, there does not appear to be another option.

> Jennifer admits that decreased motivation is part of her struggle with ongoing depression about her living situation. As she continues to experience road blocks to community living she relapses to a self-defeating cycle of increased calorie consumption as a coping mechanism.

> OBRA Assessment 2018, P.19- 20.

92.    Several Adult Foster Care Homes (AFC) declined Plaintiff due to not having barrier free homes or after determining the AFC required more money for her cost of care. It was reported in the OBRA screen that, "[t]his is an issue of conflict between the specialized residential placement agency and the CMHSP regarding what Jennifer presents as being entitled to as a Medicaid beneficiary." *Id.*, p 18.

93.    Plaintiff has been and was approved for specialized residential services, which is a Medicaid state plan service.

94. Defendants have determined Plaintiff can and should live in the community, but has not provided Plaintiff with the services she is entitled to receive.

95. Defendants identified specialized residential care as the most appropriate setting for Plaintiff, considering her needs, and though she has requested specialized residential, Defendants have failed to provide Plaintiff with those services.

## VI. LEGAL CLAIMS

### A.   First Claim for Relief:  Violation of Title II of the Americans with Disabilities Act (ADA) Integration Mandate.

96. Plaintiff incorporates by reference paragraphs 1 through 95 as if fully set forth herein.

97. Plaintiff is an individual with a disability that substantially limits one or more major life activities, including thinking and self-care. 42 U.S.C. § 12102(1).  Specifically, Plaintiff is an individual with serious mental illness, has a record of the impairment, and is regarded by all Defendants as having serious mental illness.

98. Plaintiff is a qualified individual under 42 U.S.C. § 12131(2) to participate in Medicaid as she has been and continues to receive Medicaid.

99.  Defendants, acting in their official capacities, are public entities within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1)(A), (B).

100. Plaintiff has requested, would benefit from, and has been approved for community based services, but is forced to remain in an overly restrictive nursing facility segregated from her community due to Defendants' failure to provide community based services adequate to meet her needs.

101. Plaintiff wishes to leave the nursing facility and live in a setting that is more integrated in the community where she can have greater interaction with her community and live a fulfilling life.

102. The Defendants have violated and are violating Title II of the ADA by failing to provide timely and meaningful alternatives to institutionalization. Defendants have failed to administer, manage, fund, and operate its service system to ensure Plaintiff has access to home and community-based services required to prevent her from continued institutionalization.

103. Providing Plaintiff with timely access to home and community based services would not fundamentally alter the Defendants' service system which already requires services be made available to Plaintiff

with reasonable promptness, prohibiting waiting lists and delays over 14 days.

104. Defendants' failure to provide community based services that Plaintiff requires to avoid segregation in an institution constitutes unlawful discrimination in violation of Title II of the ADA and its implementing regulations.

105. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has been institutionalized and isolated, resulting in her own health decline.

106. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has sustained injuries and damages.

107. Plaintiff seeks declaratory relief, injunctive relief, and damages for Defendants' violations under Title II of the ADA.

### B.   Second Claim for Relief: Violation of Section 504 of the Rehabilitation Act of 1973.

108. Plaintiff incorporates by reference paragraphs 1 through 107 as if fully set forth herein.

109. Plaintiff is an individual with a disability that substantially limits one or more major life activities, including self-care and thinking. 29 U.S.C. §705(20)(B); 42 U.S.C. § 12102.  Specifically, Plaintiff is an individual

with serious mental illness, has a record of the impairment, and is regarded by all Defendants as having serious mental illness.

110. Plaintiff is qualified to participate in Medicaid with or without reasonable modifications to Defendants' rules, policies, or practices. Plaintiff meets the essential eligibility requirements to receive Medicaid and does so. 29 U.S.C. §705(20)(B); 42 U.S.C. § 12102.

111. Defendants receive federal financial assistance for their programs and activities within the meaning of 29 U.S.C. § 794(b).

112. Plaintiff has requested and has been approved for community based services. Although the community is the most integrated setting appropriate to meet her needs, Plaintiff remains institutionalized in a nursing facility. Failing to provide services in the least restrictive setting appropriate to Plaintiff's needs and requiring her to remain in the institution constitutes discrimination under Section 504.

113. The Defendants have violated and are violating Section 504 of the Rehabilitation Act of 1973 and its implementing regulations by using methods of administration which substantially impair the accomplishment of the Medicaid program's goals regarding individuals with serious mental illness.

114. This includes, but is not limited to, not making timely available, and not ensuring authorized and medically necessary Medicaid services are provided.

115. Defendants' administration, management, operation, and funding of the Medicaid program has resulted in Plaintiff's continued institutionalization and isolation.

116. Providing Plaintiff with timely access to home and community based services would not fundamentally alter the Defendants' service system, which already requires that services be made available to Plaintiff with reasonable promptness, prohibiting waiting lists and delays over 14 days.

117. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has sustained injuries and damages.

118. Plaintiff seeks declaratory relief, injunctive relief, and damages for Defendants' violations under Section 504 of the Rehabilitation Act.

### C. Third Claim for Relief: Violation of 42 U.S.C. § 1983 and the Social Security Act Title XIX, 42 U.S.C. § 1396a(a)(8).

119. Plaintiff incorporates by reference paragraphs 1 through 118, as if fully set forth herein.

120. The Social Security Act at 42 U.S.C. § 1396a(a)(8), requires medical assistance to be furnished with reasonable promptness to all eligible individuals.

121. Plaintiff is entitled to receive state plan behavioral and mental health services that are medically necessary.

122. Plaintiff has not received and continues to not receive medically necessary community based services as recommended and approved by Defendant GHS in a timely manner, resulting in her continued placement in a nursing facility.

123. The Defendants have failed to provide such medically necessary services with reasonable promptness, in violation of 42 U.S.C. §1396a(a)(8) and 42 C.F.R. § 435.930(a).

124. As a result, the Defendants, acting under the color of state law, have denied Plaintiff her rights, privileges, and immunities secured by the laws of the United States.

**D.    Fourth Claim for Relief:   Violation of the Nursing Home Reform Act Amendments.**

125. Plaintiff incorporates by reference paragraphs 1 through 124, as if fully set forth herein.

126. The NHRA, 42 U.S.C. 1396r(e)(7), requires Michigan to develop and implement a PASARR program for all applicants to and residents of Medicaid certified nursing facilities.

127. Plaintiff is a resident of a licensed Medicaid facility.

128. MDHHS is responsible for administering the PASARR program.

129. Defendant, MDHHS, has violated the regulations by failing to provide Plaintiff with the choice of receiving services in the community rather than in a nursing facility.

## REQUESTED RELIEF

Wherefore, Plaintiff respectfully requests this Court to:

A.   Declare Defendants violated and are violating Plaintiff's rights under Section 504 of the Rehabilitation Act and Title II of the ADA.

B.   Declare Defendants violated and are violating Plaintiff's rights under the Social Security Act's reasonable promptness provisions and PASARR provisions.

C.   Order Defendants to provide appropriate community based services immediately.

D.   Issue injunctive relief against Defendants for violating Plaintiff's rights as complained of herein, and require them to take such

actions as are necessary to stop ongoing practices which led to this Complaint.

E.    Enter a judgment against Defendants in an amount consistent with damages sustained.

F.    Grant attorney's fees and costs.

G.    Grant any other relief to which Plaintiff is entitled or that this court deems necessary.

Dated: February 16, 2018         Respectfully submitted,


                                  /s/ Andrea L. Rizor
                                  MICHIGAN PROTECTION AND
                                  ADVOCACY SERVICE, INC.
                                  Andrea L. Rizor (P78382)
                                  Chris E. Davis (P52159)
                                  Attorneys for Plaintiff
                                  4095 Legacy Parkway, Suite 500
                                  Lansing, MI 48911
                                  (517) 487-1755
                                  arizor@mpas.org
                                  cdavis@mpas.org